Jennifer J. Chapin (MO Bar #50554)
2600 Grand Blvd., Suite 210
Kansas City, MO 64112
Telephone:  816-960-7700
Facsimile:  816-960-7751
E-mail:  jchapin@cftc.gov

Joan M. Manley
Three Lafayette Centre
1155 21st Street NW
Washington, DC 20581
Telephone: 202-418-5000
Facsimile: 202-418-5523
E-mail: jmanley@cftc.gov
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

## PHOENIX DIVISION

| | |
|---|---|
| Commodity Futures Trading Commission, | No.  CV-24-_____-PHX- |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT** |
| v. | |
| | **JURY TRIAL DEMANDED** |
| Debiex, | |
| Defendant | |
| Zhāng Chéng Yáng, | |
| Relief Defendant | |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by and

through its undersigned attorneys, hereby alleges as follows:

## I.    SUMMARY

1.    From approximately March 2022 to the present ("Relevant Period"), Defendant Debiex ("Debiex"), by and through its unknown officers and/or managers, engaged in a coordinated scheme to defraud at least five (5) U.S. customers ("Customers") located in at least five states across the country.  The scheme involved the misappropriation of at least $2.3 million from such Customers in connection with the sale of digital asset commodities such as Bitcoin and Ether, as well as digital asset commodities futures contracts.

2.    The scheme involved the coordinated efforts of at least three employee and/or agent groups:  (1) "Solicitors," who contacted Customers via at least one U.S.-based social media platform and pretended to befriend or romance the Customers in order to solicit them to open and fund trading accounts with Debiex; (2) "Customer Service," which purported to set up and service Debiex trading accounts on behalf of the Customers; and (3) "Money Mules," such as, but not limited to, Relief Defendant **Zhāng Chéng Yáng ("Zhang")**, whose digital asset wallets were used by Debiex to accept and/or misappropriate Customer funds.  These three groups were organized and supervised by Debiex's unknown officers and/or managers.

3.    It also appears that, during the Relevant Period, Debiex primarily targeted Chinese Americans.

4.    The fraudulent scheme followed a pattern.  Solicitors contacted Customers via U.S.-based social media platforms or messaging applications.  By way of continuous and repeated contacts with Customers, whereby the Solicitors cultivated friendly or romantic relationships, Solicitors claimed to have knowledge or inside information that allowed them to earn huge profits trading in digital asset commodities such as Bitcoin or Ether or digital currency

commodity futures contracts.  Once Customers decided to participate, the Solicitors introduced them to Debiex's websites, where the Customers were instructed to set up or were assisted by Customer Service with setting up their digital asset "trading accounts."  Unbeknownst to the Customers, the Debiex websites merely mimicked the features of a legitimate live trading platform and the "trading accounts" depicted on the websites were a complete ruse.  No actual trading took place on their behalf.  Instead, once Debiex received Customer funds, such funds were misappropriated by Debiex.

5. Defendant Debiex, through the use of Money Mules such as Relief Defendant **Zhang**, and perhaps others, accepted Customers' funds into digital asset wallets.

6. Debiex is operated and overseen by currently unknown officers and/or managers. Based upon information and belief, Debiex's unknown officers and/or managers:  (i) directed and controlled the Solicitors, Customer Service personnel and Money Mules; (ii) created Debiex websites that mimicked the features of a legitimate live trading platform; (iii) misappropriated at least $2.3 million in Customer funds; and (v) sent, or caused false trading records to be sent, to Customers.  These acts perpetuating Debiex's fraudulent scheme are so dramatically false that some of Debiex's unknown officers and/or managers must have known of their falsity

7. By this conduct, and the conduct further described herein, Debiex, through its unknown officers and/or managers have engaged, are engaging, and/or are about to engage in acts and practices in violation of Section6(c)(1) of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. § 9(1), and Commission Regulation ("Regulation") 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2022).

8. Debiex is liable for the conduct of these officers and/or managers pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

9. Unless restrained and enjoined by this Court, Debiex is likely to continue to engage in the acts and practices alleged in this Complaint, and similar acts and practices, as more fully described below.

10. Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to permanently enjoin Debiex's unlawful acts and practices, to compel its compliance with the Act and the Regulations, and to further enjoin it from engaging in any commodity-interest related activity, as set forth below.  In addition, the Commission seeks civil monetary penalties for each violation of the Act and Regulations, and remedial ancillary relief, including, but not limited to, trading bans, restitution, disgorgement, an accounting, pre- and post-judgment interest, and such other relief as the Court deems necessary and appropriate.

## II.     JURISDICTION AND VENUE

11. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

12. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), and 28 U.S.C. § 1391(b) because Defendant transacts or transacted business in this District, and certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur within this District.

### III.    THE PARTIES

**A.    PLAINTIFF**

13.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and Regulations.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

**B.    DEFENDANT**

14.    During the Relevant Period, **Debiex** operated publicly accessible internet domains located at https://www.debiex.com and/or https://www.debiex.net. The internet domains were both created on or about March 12, 2022 and are accessible to U.S. customers.  On its websites, Debiex claims that:

   a.  Its users "can perform two main actions on this platform: Futures Trading [and] Mining transactions;"

   b.  It is a "Blockchain Network Decentralized perpetual contract trading platform," for popular currency such as Bitcoin; and

   c.  "We work very hard to ensure every aspect of the platform. We also conduct professional audits of all smart contracts. From the ground up, we designed the DEX to be as robust as possible: from price oracles, to liquidation mechanisms, to the underlying smart contracts."

15.     Debiex's corporate status, if any, and exact location is unknown.  Debiex has never been registered with the Commission.

16.    Debiex is operated and overseen by currently unknown officers and/or managers.

**C.    RELIEF DEFENDANT**

17.    On information and belief, **Zhāng Chéng Yáng** is a Chinese national.  Based upon evidence collected to date, Zhang owns or otherwise controls a digital asset wallet with a

global digital asset commodity spot and derivatives exchange ("**Exchange A**").  Zhang created the digital asset wallet with Exchange A on or about November 28, 2022.  Zhang's digital asset wallet at Exchange A received digital assets to which he had no legitimate claim and for which he did not provide any services to Customers.  Exchange A has voluntarily preserved the funds contained in Zhang's digital asset wallet pending the outcome of this litigation.

## IV.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

18.    The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

19.    A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital asset commodities include virtual currencies, such as Bitcoin (BTC), Ether (ETH) and stablecoins such as Tether (USDT), which are digital representations of value that function as mediums of exchange, units of account and/or stores of value.  Additionally, digital asset commodities such as BTC, ETH, and USDT, as well as others, are "commodities" as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).

20.    In recent years, as digital asset markets have evolved, the CFTC has approved the offer of futures contracts on digital asset commodities, including BTC and ETH futures and

options, by boards of trade designated as contract markets by the Commission, including the Chicago Mercantile Exchange and the Cboe Digital Exchange.

21.    For purposes of this Complaint, a digital asset wallet refers to a 26- to 35-digit alphanumeric public key that operates similarly to a bank account and can be used to send and receive digital assets. While anyone can send digital assets to a particular wallet address, transferring digital assets out of a wallet address requires a private key held by the owner of the wallet address. Unlike bank accounts, wallet addresses are public information and are recorded on the blockchain for viewing by members of the public.

## V.    FACTS

### A.    The Fraudulent Scheme

22.    Throughout the Relevant Period, Debiex targeted primarily Chinese Americans with a sophisticated fraudulent scheme.  The scheme involved the coordinated efforts of three employee and/or agent groups:  (1) "Solicitors," who contacted Customers via U.S.-based social media platforms and pretended to befriend or romance the Customers in order to solicit them to open and fund trading accounts at one of Debiex's two websites; (2) Debiex's "Customer Service," which purported to set up and service Debiex trading accounts on behalf of the Customers; and (3) "Money Mules," such as, but not limited to, Zhang, whose digital asset wallets were used by Debiex to accept and/or misappropriate Customer digital assets.  These three groups were organized and supervised by Debiex's unknown officers and/or managers.

23.    This type of fraudulent scheme is commonly referred to as a "Sha Zhu Pan" or "Pig Butchering" scheme by its operators because it involves cultivating a friendly or romantic relationship with a potential victim by way of continuous and repeated contacts so as to "fatten up" victims with falsehoods in order to gain their trust and eventually solicit them to invest in a fraudulent financial opportunity.

24.     Throughout the Relevant Period, Debiex accepted the deposit of at least $2,356,406.06 worth of digital asset commodities from at least five (5) Customers into various digital asset wallets, one of which was owned and controlled by Zhang.  Contrary to the false representations made to the Customers by the Solicitors and/or Customer Service, Debiex did not use the funds to enter into any digital asset commodity transactions on behalf of the Customers.

i.     **Solicitors Formed Online Relationships with Customers and Introduced them to Debiex**

25.     Throughout the Relevant Period, the Solicitors cultivated friendly and/or romantic online relationships with the Customers by way of continuous and repeated contacts.  For example, in September 2022, **Customer A** received a request to connect on a popular, U.S.-based professional social media platform.  Customer A's Solicitor sent him multiple photographs that depicted a young, attractive Asian woman and stated that she was a divorced mother who lived in Seattle, but was originally from the same province in China as Customer A.  In October 2022, **Customer B's** Solicitor contacted him via the same professional social media platform as Customer A, and, using Customer B's native language, convinced him to move their conversation to another application, where she repeatedly chatted with him.  In December 2022, **Customer C**'s Solicitor contacted him via a messaging application and claimed to be a woman of Asian descent who lived in San Francisco.  **Customer D**'s Solicitor contacted him via a different messaging application and claimed to be a Chinese woman living in Seattle and convinced him to move their conversation to another application where she repeatedly chatted with him.  In April 2023, **Customer E**'s Solicitor found him on the same U.S.-based social media platform for professionals used to contact Customers A and B, then contacted him through a chat application and, among other things, claimed to be a Chinese female who went to the same college as he did.

26.     Solicitors established a rapport with the Customers by way of continuous and repeated messaging and sharing purported pictures of themselves.  Solicitors always claimed to be highly successful digital asset commodities traders and/or sometimes attributed their success to an "uncle" or an "insider" who provided them with inside knowledge.

27.     Once the Solicitor gained the Customer's trust, they encouraged the Customer to open a digital asset commodity trading account with Debiex and offered to share their purported inside knowledge with the Customer so that they too might earn extraordinary returns.  For example, Customer A's Solicitor told him that she traded digital asset commodities per instructions from her aunt, who had a "whole team behind her . . . to analyze the market, so [the] chance of winning is very high."  Customer A's Solicitor also told him that she had made significant profits trading on Debiex, that her biggest loss was only 10%, and that she had only suffered one trading loss.  Customer E's Solicitor told him that she had already made $30 million in profits from digital asset commodities trading and that she knew someone, a "big trader," whose trades they could copy.  Customer C's Solicitor encouraged him to invest in Debiex's "crypto futures trading platform." Customer C was also told by his Solicitor that this type of trading was risk free and she would cover any of his trading losses, if any, and that she could "access and monitor the [Debiex] database for the trading platform."

28.     The Customers understood that their funds were to be used to engage in digital asset commodity transactions for speculation based upon the statements of the Solicitors and the Debiex websites.

29.     Once a Customer decided to participate, the Solicitor then introduced them to Defendant Debiex.  For example, both Customer C and Customer E were directed to use the

browser in their U.S.-based digital asset exchange platform mobile applications to select the Debiex.net website.

**ii.      Customers Sent Funds to Digital Wallet Addresses They Were Led to Believe Belonged to Debiex**

30.     In order to fund their purported Debiex digital asset commodity trading accounts, either the Solicitors or Customer Service provided Customers with digital wallet addresses.  For example, Customer A sent approximately $9,000 to a U.S.-based digital asset exchange platform suggested by his Solicitor, converted his fiat currency to ETH and USDT, and then sent the ETH and USDT to a digital wallet address provided to him by his Solicitor, which he was led to believe belonged to Debiex.

31.     In addition, both Customers A and B sent their ETH to the exact same digital asset wallet.  Customer A's transfers occurred in September 2022 and Customer B's transfers occurred in September and October 2022.  Some of Customer D's digital assets he intended for digital asset commodity trading with Debiex were also eventually transferred by Debiex's unknown officers and/or control persons into that same wallet.

32.     Over time, Customer A noticed that the digital asset wallets to which he was instructed to send funds changed, but he continued to send funds because he trusted what his Solicitor had told him about her trading experience with Debiex.

33.     At the direction of his Solicitor, Customer E liquidated his individual retirement account (worth approximately $250,000), wired the funds to a digital asset platform suggested by his Solicitor, converted his fiat currency to ETH, converted it once more to USDT, and then sent it to a digital asset wallet that his Solicitor led him to believe was Debiex's.

**iii.      Debiex Provided False Trading Records to Customers**

34.     After sending their funds to the U.S.-based digital asset commodity exchange platform and converting them to digital asset commodities, which they then sent to digital asset wallets they had been led to believe belonged to Debiex, Customers all believed they had opened actual trading accounts on Debiex's platforms.

35.     In fact, based upon information and belief, Defendant Debiex's websites simply allowed Customers to interface with Customer Service representatives, who controlled the information provided to the Customers via the Debiex websites.  Through the use of Debiex websites, Customer Service provided Customers with fictitious information concerning, among other things:  profits and losses, account balances, digital asset commodity trading transactions, and deposits and withdrawals of funds into and out of their trading accounts.

36.     All of this information was most likely false.  The evidence shows that the Customers' digital assets were simply sent to numerous digital asset wallets in an attempt to obfuscate their destination.  In short, there is no evidence that the Customers' digital assets were "traded" for another digital asset, as portrayed in the Customers' trading platform records.

37.     The false statements by the Solicitors and Customer Service and the false statements on the Debiex websites were so important and dramatically false that Debiex's unknown officers and/or managers knew about the fraud, or at the very least, engaged in an extreme departure from the standard of care a reasonable person would undertake in similar circumstances.

        iv.     **At Least One Customer's Funds were Deposited into Zhang's Digital Asset Wallet**

38.     From December 2022 to January 2023, Customer D deposited approximately $445,000 worth of ETH into digital asset wallets he thought belonged to Debiex.

39.     However, an analysis of Customer D's digital assets revealed that they very quickly moved via transfers through a succession of several digital asset wallets.

40.     For example, soon after Customer D transferred his ETH to a wallet controlled by Debiex, those digital asset commodities were transferred to a U.S.-based decentralized digital asset exchange and converted to USDT.

41.     Ultimately, $168,820 worth of Customer D's digital asset commodities were transferred to a wallet at Exchange A, a global digital asset spot and derivatives exchange.  This Exchange A wallet belongs to Relief Defendant Zhang, a Chinese national.  Based on information and belief, Zhang is acting as a Money Mule for Debiex.

42.     Customer D does not know who Zhang is and never received any services from Zhang.

43.     Exchange A is voluntarily preserving these digital assets in Zhang's wallet pending the outcome of this litigation.

        **v.     Debiex Used False Trading Successes to Solicit Additional Funds from Customers**

44.     Once their accounts were funded, the Solicitors provided Customers with purported trading advice.  The Solicitors instructed the Customers which digital asset commodity the Customers should purportedly "trade" and when they should enter and exit each "trade."

45.     Overall, the Customers were led to believe that they were earning incredible returns from their trading.  The Customers' Debiex accounts generally showed consistent trading gains with very few, if any, losses.

46.     For example, Customer B was told that his digital assets initially worth $425,888 had grown to about $15 million after he transferred them to Debiex for trading purposes.

Customer E was told that his digital assets commodities initially worth $252,500 had generated a $2 million profit after he transferred them to Debiex for trading.

47.     The Solicitors used these purported successes to encourage Customers to deposit additional funds with Debiex.

### vi.    Debiex Used Fraudulent Tactics to Prevent Customers from Withdrawing Funds and to Obtain More Funds

48.     Debiex's Customer Service, and, sometimes, the Solicitors, employed tactics to further defraud Customers, such as falsely telling them that they would need to pay taxes before their funds could be withdrawn.  As a result, some of the Customers transferred additional funds to their trading accounts to cover these "taxes."  For example, Customer A was told that he had to pay a 37% tax, as calculated by his account value, before he could withdraw his purported trading profits.  Customer E was told that he had to pay a $888,000 tax payment to Debiex before he could withdraw his purported trading profits.  When Customer E protested, his Solicitor said she would loan him some of the money necessary to make the tax payment, but that he would still have to pay $150,000 to Debiex.  The tax payments were just a ruse and Customers were unable to withdraw their funds even after submitting these "taxes."

49.     In another example, a Solicitor told Customer C that her account was frozen by Debiex when she tried to transfer $2 million in trading profits back to him.  The Solicitor then told Customer C to open an account at a U.S.-based digital asset trading platform so she could provide him with specific instructions about which digital asset commodity to trade while her Debiex account was locked.  Customer A complied with his Solicitor's instructions and ultimately transferred an additional $252,000 to Debiex.

50.     In yet another example, Customer Service told Customer B that he could not make withdrawals and that he had to deposit more funds in order to "increase" his credit score.

Customer Service then threatened Customer B by telling him that if he did not deposit more funds "It will affect your other investment and financial products, and also freeze your bank account, stocks, funds, etc."  Fearing these consequences, Customer B provided additional funds to Debiex.

51.      Customer B was also told by Customer Service that he needed to become a "VIP" so his withdrawals would go through the purported "VIP withdrawal channel" more quickly. When he asked how to open a VIP withdrawal channel, he was told that he could pay $188,888 for a month of unlimited withdrawals; $388,888 for a quarter of unlimited withdrawals; or $888,888 for a full year of unlimited withdrawals.

52.      With the exception of Customer D, who received a very small amount of his funds back at the outset of the fraud, none of the Customers were able to withdraw their funds from their purported Debiex trading accounts.  For example, Customer A tried multiple times to make withdrawals from his Debiex account, but received the following excuses from Customer Service:

> a.  Hello, because you are operating too frequently, please try again in an hour!
>
> b.  Hello, please clear your cache, log out and log in again.
>
> c.  Hello! This is caused by your network, please refresh and try to withdraw funds again!

53.      When Customer B tried to withdraw funds from his Debiex account, he received the following two nonsensical messages from Customer Service within 20 minutes of each other:

> a.  Hello, the system has detected that there is a third party in your accounts who is making profits with data, which has seriously violated the platform rules. Please standardize your operations and build a green platform.
>
> b.  Hello, for the safety of your funds, you need to re-authenticate your account, the frozen state can be lifted and the normal withdrawal business can resume after unfreezing! You need to provide the front and back photos of your ID card and take

photos to the customer service for identify verification and pay 60% of the risk fund of your personal account balance to your personal account for account fund verification. After the review is passed you can carry out the normal cash withdrawal business again!

54.     Once Customers stopped making deposits, Debiex's Customer Service and/or the Solicitors either stopped communicating with them or continued to pressure them to make purported tax payments so they could receive their purported trading profits.

55.     During the Relevant Period, Customer A transferred a total of approximately $9,000 to Debiex.

56.     During the Relevant Period, Customer B transferred a total of $967,018 to Debiex.

57.     During the Relevant Period, Customer C transferred a total of $677,888 to Debiex.

58.     During the Relevant Period, Customer D transferred a total of $445,000 to Debiex, of which he received back a very small amount.

59.     During the Relevant Period, Customer E transferred a total of $252,500 to Debiex.

**B.     Debiex's Unknown Officers and/or Managers Knew or Should Have Known They Were Operating a Fraudulent Scheme and Not a Legitimate Digital Asset Trading Platform**

60.     The fraud committed under the auspices of the Debiex enterprise was coordinated and consistent in its application.  Such manifestations of organization could only result if Debiex's unknown officers and/or managers intentionally or recklessly created the false websites and directed the Solicitors and Customer Service representatives to engage in fraud.

15

61.     Based upon information and belief and the known facts and circumstances, Debiex's unknown officers and/or managers directed Solicitors to contact and establish phony relationships with Customers wherein they touted their knowledge or inside information that allowed them to earn huge profits trading in digital asset commodities and encouraged Customers to open trading accounts.

62.     Based upon information and belief and the known facts and circumstances, Debiex's unknown officers and/or managers created Debiex websites that mimicked the features of a legitimate live trading platform.

63.     Based upon information and belief and the known facts and circumstances, Debiex's unknown officers and/or managers directed Customer Service to make additional lies in order to maintain the illusion of a legitimate trading platform.

64.     Debiex's unknown officers and/or managers misappropriated at least $2.3 million in Customer digital assets by transferring at least $168,820 of digital assets into Zhang's digital asset wallet and the balance into other known and unknown digital asset wallets.

65.     Based upon information and belief and the known facts and circumstances, Debiex's unknown officers and/or managers sent, or caused false trading records to be sent to Customers.

66.     These acts perpetuating Debiex's scheme are so dramatically false that some of Debiex's unknown officers and/or managers knew or should have known of their falsity. Because these unknown officers and/or managers engaged in this conduct on behalf of Debiex, Debiex is culpable for their conduct.

**COUNT I**
**FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE**
**Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1) and (3),**
**17 C.F.R. § 180.1(a)(1), (3) (2022)**

67.     The allegations in paragraphs 1-66 are re-alleged and incorporated herein by reference.

68.     7 U.S.C. § 9(1) makes it "unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . . ."

69.     17 C.F.R. § 180.1(a)(1) and (3) makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> 1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; [or]
>
> 3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . ."

70.     Digital asset commodities such as BTC and ETH are encompassed in the definition of a "commodity" under Section 1a(9) of the Act, 7 U.S.C. § 1a(9), and contracts for their sale are subject to the prohibitions of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

71.     During the Relevant Period, Debiex officers and/or managers violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3), by, among other things, intentionally or recklessly: (1) directing Solicitors to make continuous and repeated contacts with Customers, whereby they established phony friendly or romantic relationships with Customers wherein they touted their

knowledge or inside information that allowed them to earn huge profits trading in digital asset commodities and encouraged Customers to open trading accounts; (2) creating Debiex websites that mimicked the features of a legitimate trading platform; (3) directing Customer Service to make additional lies in order to maintain the illusion of a legitimate trading platform; (4) misappropriating at least $2.3 million in Customer digital assets by transferring at least $168,820 of digital assets into Zhang's digital asset wallet and the balance into other known and unknown digital asset wallets; and (5) sending, or causing false trading records to be sent to Customers.

72.     These acts perpetuating Debiex's scheme are so dramatically false that some of Debiex's unknown officers and/or managers knew or should have known of their falsity. Because these unknown officers and/or managers engaged in this conduct on behalf of Debiex, Debiex is culpable for their conduct

73.     Debiex's unknown officers and/or managers engaged in the acts and practices described above using instrumentalities of interstate commerce, including but not limited to: interstate wires for transfer of funds, email, websites, and other electronic communication devices.

74.     Each act of misappropriation and fraudulent provision of false trading records, including but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3).

75.     Debiex is liable for the conduct of these unknown officers and/or managers pursuant to Section 2(a)(1) of the Act, 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2, 17 C.F.R. § 1.2 (2022).

76.     Relief Defendant Zhang received ill-gotten gains from Debiex's fraudulent conduct, to which he had no legitimate claim and for which he did not provide any services to Customers.  Therefore, he must disgorge Customer D's digital assets that were traced to his digital asset wallet regardless of whether he actually violated any of the anti-fraud provisions of the Act and the Regulations.

## VI.     RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to the Court's inherent equitable powers, enter:

A.      An order finding Defendant liable for violating Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1) and (3), 17 C.F.R. § 180.1(a)(1), (3) (2022);

B.      An order of permanent injunction permanently restraining, enjoining, and prohibiting Defendant, and any other person or entity associated with it, from engaging in conduct described above, in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) and (3);

C.      An order of permanent injunction prohibiting Defendant and any other person or entity associated with it from directly or indirectly:

(i)     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § la(40));

(ii)    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022) or "digital asset commodities" (as described herein), including Bitcoin and Ether, for their own personal account(s) or for any account(s) in which any Defendant has a direct or indirect interest;

(iii)   Having any commodity interests or digital asset commodities, including Bitcoin and Ether, traded on Defendant's behalf;

(iv)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests or digital asset commodities, including Bitcoin and Ether;

(v)   Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests or digital asset commodities, including Bitcoin and Ether;

(vi)   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

(vii)   Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2022)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2022);

D.   An order directing Defendant and any successors thereof to withdraw or remove any and all websites that offer to enter into, enter into, execute, or confirm the execution of any transaction subject to the Commission's jurisdiction under Section 2(c)(2)(D) of the Act, or any contract for the purchase or sale of a commodity for future delivery with U.S. customers;

E.   An order directing the Defendant and any successors thereof to provide current and future web hosts of Defendant's website a copy of any injunctive order finding liability for and/or enjoining further violations of the Act;

F.   An order directing Defendant and Relief Defendant, as well as any successors thereof, holding companies, and alter egos, to disgorge, pursuant to such procedure as the Court

may order, all benefits received from the acts or practices which constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

G.      An order directing Defendant and Relief Defendant, as well as any successors thereof, holding companies, and alter egos, to make full restitution to every person who has sustained losses proximately caused by the violations of the Act and Regulations described herein, and pre- and post-judgment interest thereon from the date of such violations;

H.      An order directing Defendant, as well as any successors thereof, to provide a full accounting of all Customer funds they have received during the Relevant Period as a result of the acts and practices that constituted violations of the Act and Regulations, as described herein;

I.      An order directing Defendant to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act and Regulations described herein;

J.      An order requiring Defendant to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

K.      Such other and further relief as the Court deems proper.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: January 17, 2024

Respectfully submitted,

*Jennifer J. Chapin*

Jennifer J. Chapin (MO Bar #50554)
Senior Trial Attorney, Division of Enforcement
Commodity Futures Trading Commission
2600 Grand Blvd., Suite 210
Kansas City, MO 64108
Telephone:  816-960-7700
Facsimile:   816-960-7751
E-mail:  jchapin@cftc.gov

Joan M. Manley
Deputy Director, Division of Enforcement
Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street NW
Washington, DC 20581
Telephone: 202-418-5000
Facsimile: 202-418-5523
E-mail: jmanley@cftc.gov