**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Commodity Futures Trading Commission, | No. CV-24-00117-PHX-DLR |
| Plaintiff, | **ORDER** |
| v. | |
| Debiex, et al., | |
| Defendants. | |

Plaintiff Commodity Futures Trading Commission's ("CFTC") complaint accuses Defendant Debiex of engaging in a coordinated scheme to defraud U.S. customers ("Customers") in violation of the Commodity Exchange Act, 7 U.S.C. § 9(1) ("the Act"), and corresponding CFTC regulations ("Regulations"). The complaint names Zhang Cheng Yang ("Zhang") as a Relief Defendant because the CFTC believes Zhang acts as a money mule for Debiex. (Doc. 1.) Despite being served with a summons and the complaint (Docs. 14, 19), Zhang failed to appear and answer or otherwise respond to the complaint, prompting the CFTC to apply for and the Clerk of the Court to enter default against Zhang (Docs. 21, 22.) Now before the Court is the CFTC's motion for entry of a default judgment against Zhang (Doc. 26), which will be granted.

**I. Factual Background[1]**

From approximately March 2022 to the date the CFTC filed this lawsuit ("Relevant

---

[1] Unless otherwise noted, these facts are derived from the CFTC's complaint and presumed true given Zhang's default.

Period"), Debiex operated publicly accessible internet domains located at https://www.debiex.com and/or https://www.debiex.net. On its websites, Debiex claimed that (1) its users "can perform two main actions on this platform: Futures Trading [and] Mining transactions," (2) it is a "Blockchain Network Decentralized perpetual contract trading platform," for popular currency such as Bitcoin, and "We work very hard to ensure every aspect of the platform. We also conduct professional audits of all smart contracts. From the ground up, we designed the DEX to be as robust as possible: from price oracles, to liquidation mechanisms, to the underlying smart contracts." Debiex's corporate status (if any) and exact location are unknown, as Debiex has never been registered with the CFTC. Debiex is operated and overseen by currently unknown officers and/or managers.

Relief Defendant Zhang is a Chinese national. Zhang owns or otherwise controls a digital asset wallet with a global digital asset commodity spot and derivatives exchange ("Exchange A").[2] Zhang created the digital asset wallet with Exchange A around November 28, 2022. Zhang's digital asset wallet at Exchange A received digital assets to which he had no legitimate claim and for which he did not provide any services to Customers. Exchange A has voluntarily preserved the funds contained in Zhang's digital asset wallet pending the outcome of this litigation. Zhang is believed to be evading detection by both the CFTC and the China Securities Regulatory Commission. (Doc. 12 at 8.)

Throughout the Relevant Period, Debiex targeted primarily Chinese Americans with a sophisticated fraudulent scheme involving the coordinated efforts of three employee and/or agent groups: (1) "Solicitors," who contacted Customers via U.S.-based social media platforms and pretended to befriend or romance the Customers in order to solicit them to open and fund trading accounts at one of Debiex's two websites; (2) Debiex's "Customer Service," which purported to set up and service Debiex trading accounts on behalf of the Customers; and (3) "Money Mules," such as Zhang, whose digital asset

---

[2] The CFTC did not identify Exchange A in its complaint and the Court will not identify it here because the CFTC does not believe it is connected to Debiex's fraud.

wallets were used by Debiex to accept and/or misappropriate Customer digital assets. These three groups were organized and supervised by Debiex's unknown officers and/or managers. This type of fraudulent scheme is commonly referred to as a "Sha Zhu Pan" or "Pig Butchering" scheme by its operators because it involves cultivating a friendly or romantic relationship with a potential victim through continuous and repeated contacts to "fatten up" victims with falsehoods, gain their trust, and eventually solicit them to invest in a fraudulent financial opportunity.

Throughout the Relevant Period, Debiex accepted the deposit of digital assets, valued at approximately $2.3 million from at least five Customers into various digital asset wallets. One of these wallets was owned and controlled by Zhang. Contrary to the false representations made to the Customers by the Solicitors and/or Customer Service, Debiex did not use the funds to enter any digital asset commodity transactions on behalf of the Customers. (Doc. 26-1 at ¶¶ 42, 50.)

Solicitors established a rapport with the Customers through continuous and repeated messaging and sharing purported pictures of themselves. Solicitors always claimed to be highly successful digital asset commodities traders, sometimes attributing their success to an "uncle" or an "insider" who provided them with inside knowledge. Once the Solicitor gained the Customer's trust, they encouraged the Customer to open a digital asset commodity trading account with Debiex and offered to share their purported inside knowledge with the Customer so that they too might earn extraordinary returns.

Once a Customer decided to participate, the Solicitor then introduced them to Defendant Debiex. To fund their purported Debiex digital asset commodity trading accounts, either the Solicitors or Customer Service provided Customers with digital wallet addresses. After sending their funds to the U.S.-based digital asset commodity exchange platform and converting them to digital asset commodities, which they then sent to digital asset wallets they had been led to believe belonged to Debiex, Customers all believed they had opened actual trading accounts on Debiex's platforms. But Defendant Debiex's websites simply allowed Customers to interface with Customer Service representatives,

who controlled the information provided to the Customers via the Debiex websites. Using Debiex websites, Customer Service provided Customers with fictitious information concerning profits and losses, account balances, digital asset commodity trading transactions, and deposits and withdrawals of funds into and out of their trading accounts. This information was likely false; Customers' digital assets were simply sent to numerous digital asset wallets to obfuscate their destination. There is no evidence that the Customers' digital assets were "traded" for another digital asset, as portrayed in the Customers' trading platform records.

The statements by the Solicitors and Customer Service and the statements on the Debiex websites were important and so clearly false that Debiex's unknown officers and/or managers either knew about the fraud or departed from the standard of care a reasonable person would undertake in similar circumstances.

Once their accounts were funded, the Solicitors provided Customers with purported trading advice. The Solicitors instructed the Customers which digital asset commodity the Customers should purportedly "trade" and when they should enter and exit each "trade." The Customers were led to believe that they were earning substantial returns from their trading. The Customers' Debiex accounts generally showed consistent trading gains with few (if any) losses. The Solicitors used these purported successes to encourage Customers to deposit additional funds with Debiex. Debiex's Customer Service, and sometimes the Solicitors, employed tactics to further defraud Customers, such as falsely telling them that they would need to pay taxes before their funds could be withdrawn. As a result, some of the Customers transferred additional funds to their trading accounts to cover these "taxes." The tax payments were a ruse, and Customers were unable to withdraw their funds even after submitting these "taxes." Once Customers stopped making deposits, Debiex's Customer Service and/or the Solicitors either stopped communicating with them or continued to pressure them to make purported tax payments so they could receive their purported trading profits.

Zhang owns or otherwise controls a digital asset wallet with Exchange A that

received digital assets to which he had no legitimate claim and for which he did not provide any services to Customers.

Customer D, who resides in this District, was contacted by his Solicitor via a messaging application. (Doc. 26-1 at ¶ 61.) Customer D's solicitor claimed to be a Chinese woman living in Seattle and she convinced him to move their conversation to another application where she repeatedly chatted with him. From December 2022 to January 2023, Customer D transferred Ether ("ETH") digital assets worth approximately $435,793 at the time of transfer, via 7 separate transfers into digital asset wallets he thought belonged to Debiex. (*Id.* ¶¶ 62-75.) During his conversations with and solicitations by Debiex's Solicitors, who were trying to convince him to send more funds, Customer D also received approximately 9,990 Tether ("USDT") back, which means he transferred to Debiex a net total of digital assets worth approximately $425,893. (*Id.* ¶ 63.)

An analysis of Customer D's digital assets revealed that they quickly moved via transfers through a succession of several digital asset wallets, the owners of which are unknown. (*Id.* ¶¶ 65-75.) On December 30, 2022, Customer D transferred 131.08 ETH to a digital asset wallet he thought was controlled by Debiex, but the owner of which is unknown. (*Id.* ¶ 66.) Customer D's 131.08 ETH was quickly transferred a second time to another digital asset wallet, the owner of which is unknown. (*Id.* ¶ 67.) In the third transfer, where Customer D transferred 131.08 ETH to a wallet he thought was controlled by Debiex, his digital asset commodities were transferred to a U.S.-based decentralized digital asset exchange and converted to USDT. (*Id.* ¶ 68.) Customer D's converted digital assets then moved through several more wallets as 155,479.77 USDT. (*Id.* ¶¶ 69-74.) Finally, on January 2, 2023, 155,479.77 of Customer D's USDT was transferred to Wallet 0x01c04937Dcf5005b816b465282db8FdcedEEb5Ef, a wallet that has been identified as associated with Exchange A and which was subsequently determined to belong to Zhang. (*Id.* ¶ 75.) This digital asset tracing of Customer D's digital assets from his wallet to Zhang's wallet at Exchange A is confirmed by two other digital asset traces. (*Id.* ¶¶ 78-81.) Customer D, however, does not know Zhang and never received any services from

him. (*Id.* ¶ 77.)

Exchange A is voluntarily preserving these assets pending the outcome of this litigation. Exchange A has had the following digital assets frozen in Zhang's account since approximately May 25, 2023:

| Digital asset/Token | Balance |
| --- | --- |
| ETH (Ether) | 62.94155 |
| USDT (Tether) | 5.7041258 |

(*Id.* ¶ 58.) These remaining digital assets in Zhang's wallet are directly traceable back to Customer D's initial transfer of 131.08 ETH he intended for Debiex. (*Id.* ¶ 83.)

**II. Analysis**

Whether to enter a default judgment is discretionary. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The Court may consider the following factors when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether default is due to excusable neglect, and (7) the policy favoring decisions on the merits. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). In considering the merits and sufficiency of the complaint, the Court accepts as true the complaint's well-pled factual allegations. *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). Although the Court should consider and weigh relevant factors as part of the decision-making process, it "is not required to make detailed findings of fact." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). These factors favor entry of default judgment.

The CFTC's complaint adequately alleges that Zhang, a relief defendant, owns or otherwise controls a digital asset wallet with Exchange A that received digital assets to which he had no legitimate claim and for which he did not provide any services to Customers. This Court may grant equitable relief against a relief defendant if it is established that the relief defendant possesses property or profits illegally obtained and the relief defendant has no legitimate claim to them. *See SEC v. Cavanagh*, 155 F.3d 129, 136

(2d Cir. 1998) ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.") (citing *SEC v. Colello*, 139 F.3d 674, 676 (9th Cir. 1998)).

Given Zhang's default, there are no genuine factual disputes that would counsel against entry of default judgment. Absent entry of default judgment, the CFTC and Customer D "will likely be without other recourse for recovery." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

Although the amount of money at stake is substantial, the CFTC has demonstrated that Zhang received ill-gotten gains from Debiex's fraudulent conduct to which he had no legitimate claim and for which he did not provide any services. To prevent a defendant from misappropriating fraudulent gains, a court may order a relief defendant to disgorge the ill-gotten funds they received. *See S.E.C. v. World Capital Mkt., Inc.*, 864 F.3d 996, 1003 (9th Cir. 2017). This is the type of relief that the CFTC seeks against Zhang.

There is no evidence that Zhang's failure to respond to the complaint is the result of "excusable neglect." And although cases "should be decided on their merits whenever reasonably possible" *Eitel*, 782 F.2d at 1472, the existence of Federal Rule of Civil Procedure 55(b) "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (citation omitted). Accordingly,

**IT IS ORDERED** that the CFTC's motion for entry of default judgment against Relief Defendant Zhang (Doc. 26) is **GRANTED** as follows:

1. All cryptocurrency held in Zhang's digital asset account with Exchange A, including with the deposit cryptocurrency wallet address 0x01c04937dcf5005b816b465282db8fdcedeeb5ef in the custody of Exchange A, subject to and excluding any tokens below any reasonable minimum withdrawal amount imposed by Exchange A, shall be sent to Ethereum wallet address 0x2f57eeE8C304CDfdE848028a6C89AC00B364B004, which belongs to Customer D ("Restitution Obligation"). More specifically, the following tokens shall be transferred as

the Restitution Obligation:

| Digital asset/Token | Balance |
|---|---|
| ETH (Ether) | 62.94155 |
| USDT (Tether) | 5.7041258 |

2. Pursuant to Fed. R. Civ. P. 71, Customer D, who suffered losses proximately caused by Debiex and/or Zhang, is made a third-party beneficiary of this Order and may seek to enforce this Order to obtain satisfaction of any portion of the Restitution Obligation.

3. The relief in this Order shall be binding on Debiex and Zhang, upon any person under their authority or control, and upon any person who receives actual notice of this Order, by personal service, email, facsimile or otherwise insofar as he or she is acting in active concert or participation with Debiex and/or Zhang.

4. If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

5. The Clerk of the Court is directed to enter judgment accordingly.

Dated this 12th day of March, 2025.

Douglas L. Rayes
Senior United States District Judge